*Middlesex,*
*July, 1851.*

Wright
*v.*
Wright.

In this opinion the other Judges concurred.

Judgment affirmed.

---

BENJAMIN WRIGHT *against* MARTIN WRIGHT:

21 329
75 534

### IN ERROR.

Where the plaintiff in an action, founded on the 8th section of the statute concerning Fences, to recover the sum awarded to him, by the fence-viewers, alleged, that he and the defendant were owners of enclosed lands, separated by a stone-wall, which was originally built, entirely, by *W*, under whom the plaintiff holds, and which, in consequence of a division of the land, in *July*, 1826, it became the duty of the defendant to unite with the plaintiff in dividing, and to pay the plaintiff such sum as should be awarded, by the fence-viewers; it was held, that the fence-viewers, on the plaintiff's application, had power and right to divide and apportion the fence anew.

Where it further appeared, from a plea of the defendant, that *W*, and those whose estate he had, and the plaintiff now has, for more than thirty years before *July*, 1826, were accustomed to make and maintain such wall, at their own cost, without expense to the defendant, or to those whose estate he has; it was held, 1. that these facts did not constitute a prescription, binding upon the plaintiff, being at most only evidence of one; 2. that such usage was not of the nature of a covenant which runs with the land, through all time, but was temporary, governing only the immediate owners and the land as it then was.

It is a legal incident or appurtenance, attached *per se* to all lands enclosed and holden in severalty, running with them perpetually, and unaffected by ulterior divisions and subdivisions, that each of the adjoining proprietors shall make and maintain one-half of the division fence.

The division of enclosed lands, by sale or otherwise, *prima facie* subjects them to a new division of the fence among the new owners.

Where the objection to a recovery in such action, was, that it did not appear, that there was *no record* of a division of the fence; it was held, that the objection was unavailing.

If, in this case, the plaintiff's grantor built the entire fence originally, and

the plaintiff and defendant have enjoyed it, for more than fifteen years, this does not shew that the plaintiff is bound, by prescription, to maintain the entire fence in its present condition; for there was nothing of an adverse character in the user, neither party having done any more than he was obliged to do, in order to the full and secure enjoyment of his property.

If such user could be considered as evidence of an agreement of the parties to that effect, during its continuance, the evidence might be resisted, by shewing *why* and *how* the user took place.

The law of this state is different from that of *Massachusetts* and of *England*, in this respect; that here, the owner or occupier of the land is obliged to fence it against cattle, at his own risk, and if his land is not fenced, he can neither recover damages, nor impound for a trespass by cattle; whereas in *Massachusetts* and in *England*, the owner of the cattle must restrain them, at his own risk, or he will be liable, if they trespass upon the lands of others.

Where it appeared, that the sum awarded by the fence-viewers, under the 8th section of the statute, was made up of a certain sum *per* rod of one-half of the fence set to the defendant, and of interest thereon, for a period extending back beyond the demand for a division of the line; it was held, that the fence-viewers had not exceeded their jurisdiction, nor was their judgment as to the amount, subject to revision by the court. [One judge dissenting, on most of the positions above stated.]

Tнıs was originally an action brought by *Martin Wright* against *Benjamin Wright*, on the statute concerning Fences, &c., to recover the sum of forty dollars, awarded by the fence-viewers, under the 8th section of that statute.

The declaration stated, that on the 13th day of *July*, 1826, *Martin Wright*, now deceased, owned a certain tract of land, or particular enclosure, situated in *Westbrook*, bounded *Westerly* on the highway, and every other way on the land of the defendant, and containing eighteen acres; the division fence betwixt which land of said *Martin Wright* and of the defendant was equally owned and maintained by them severally, and divided; the entire *Southerly* and so much of the *Easterly* line as constituted the one-half part thereof, being owned and maintained by said *Martin Wright*; that said *Martin Wright* afterwards, on the same day, sold and conveyed the whole of said tract of land, as follows—four and one-fourth acres, across the *Northerly* part thereof, to *Richard W. Wright*, seven and three-fourths acres to *D. B. Wright*, and the remainder, being five acres and thirty rods of land, the same being bounded *Southerly* on the defendant's said land, and *Westerly* on highway, to the plaintiff; that the defendant ever since has owned, and now does own, said

land, so surrounding and adjoining the land or particular enclosure, owned by said *Martin Wright*, deceased, except on the highway as aforesaid, and during all said time, has been, and now is, liable to maintain the one-half of said division fence; that by said sales and conveyances by said *Martin Wright*, deceased, a division of said division fence betwixt the proprietors of said land and the land of the defendant, became and is necessary; that betwixt said land of the plaintiff, being part of the particular enclosure of said *Martin Wright*, as aforesaid, and the land of the defendant, adjoining the same *Southerly*, there has been, during all the time aforesaid, and still is, a division fence, being stone fence, and part of the division fence as aforesaid, which fence runs the whole width of the plaintiff's land, and is thirty-two and a half rods in length, and is butted *Westerly* on the highway; that said fence has never, until the time hereinafter mentioned, been divided betwixt the plaintiff and defendant; and that the plaintiff has, at all times, ever since the said 13th day of *July*, 1826, and now does, own and improve said land so conveyed to him by said *Martin Wright*, and has, during all said time, until the division hereinafter mentioned, owned and maintained the whole of said fence; that during all the time aforesaid, it was, and now is, the duty of the defendant to purchase of the plaintiff and maintain the one-half part of said division stone fence, the lands of both parties being particular enclosures and improved, and said fence being at all times necessary; but the defendant has, at all times, neglected and refused so to do, though often requested and demanded by the plaintiff; and the plaintiff and defendant not being able to agree respecting a division of said fence, the plaintiff did thereupon call out two of the fence-viewers of said *Westbrook*, in which town said fence is situated, to wit, *William A. Bushnell* and *Aaron Stevens*, who, being under oath, did, on the 24th day of *January*, 1849, view said line of division fence, and did then and there make a division and apportionment thereof, as follows—to said *Benjamin Wright*, defendant, they did set, divide and apportion the *Easterly* half or part of said fence, being stone fence, commencing at the *Westerly* end, at the *South-east* corner of the plaintiff's land, and running thence *Westerly*, sixteen rods, including the bars, and eight links, to a heap of stones by

*Middlesex,*
July, 1851.

Wright
*v.*
Wright.

said fence on the *Southerly* side thereof, and the remaining or *Westerly* half or part of said fence, they determined should remain the property of the plaintiff; which said division and apportionment was necessary to do justice to said parties. And said fence-viewers did further, then and there, award, after hearing said parties in the premises, that the defendant should pay therefor to the plaintiff the sum of forty dollars, to be paid at the end of twenty days from that date, the same being just and reasonable; which award was in writing, and signed by said fence-viewers, and was duly recorded in the records of said town of *Westbrook*, on the 26th day of *January*, 1849; of all which the defendant had due notice.

The defendant pleaded four pleas. The first was, that the cause of action, (*viz.* the partition of the eighteen acre lot in 1826,) did not accrue within six years before the commencement of the suit.

The second plea alleged, that for more than thirty years before the 13th day of *July*, 1826, said *Martin Wright*, deceased, and those whose estate he had, and the plaintiff now has, were accustomed to make and maintain said fence, described as about thirty-two and a half rods long, at their own cost and charges, and without expense to the defendant, or those whose estate he has; and the plaintiff, at the time of the pretended division by said fence-viewers, was bound in law to make and maintain the whole of said fence so divided, at his own cost and charge, and the defendant was not liable to make, or maintain, or pay for any part thereof.

The third plea averred, that the fence described in the declaration as being about thirty-two and a half rods long, and as having been divided by said fence-viewers, was made by the plaintiff, without the defendant's knowledge or consent, and against his will, on the land, which, at the time it was so built, and until long after said pretended division by said fence-viewers, was, and continued to be, owned and occupied by the defendant; and said fence was, at the time of such pretended division, owned by the defendant, and so was not subject to such division and award by said fence-viewers, at the request of the plaintiff.

The fourth plea averred, that said fence-viewers, in making their said award, made a gross error, miscalculation and mis-

take, inasmuch as they allowed to the plaintiff, in their
award, interest on the value and expense of the one-half of
said fence, so divided, for a long time, *viz.* for more than
fourteen years, before said division and award, and long be-
fore any claim or demand for a division of said fence was
made by the plaintiff of the defendant, or was proved or pre-
tended to have been so made before said fence-viewers.

To the first and second of these pleas the plaintiff demur-
red.   To the third plea he replied, that the division fence,
described in said plea, was built, by those under whom the
plaintiff claims, upon the boundary line, between the lands
owned by those under whom the plaintiff claims, and those
under whom the defendant claims, and with the knowledge
and consent of the defendant, and those under whom he
claims ; and that it has ever since continued to be, and still
is, upon said boundary line ; traversing the allegation that
said fence was made by the plaintiff, without the defend-
ant's knowledge and consent, and against his will, on land,
which, at the time it was so built, and until long after the
division of said fence, by said fence-viewers, was, and con-
tinued to be, owned and occupied by the defendant.

To the fourth plea, the plaintiff replied, that said fence-
viewers, in making their award, did not make any gross
error, miscalculation or mistake, either in the manner set
forth in the said plea, or in any other respect or particular
whatever.

On the third and fourth pleas, and the replications thereto,
issues were joined to the court.   After a full hearing, the
court decided, that the first and second pleas were insuffi-
cient, and found the issues of fact on the third and fourth
pleas in favour of the plaintiff ; and thereupon rendered judg-
ment, that the plaintiff recover of the defendant the sum of
forty dollars, and his costs of suit.

In the course of the trial, the defendant, in support of the
fourth plea, offered in evidence the testimony of *Aaron Ste-
vens*, one of the fence-viewers mentioned in the plaintiff's
declaration, that they allowed to the plaintiff, in their award,
the sum of one dollar and twenty-five cents per rod, for the
sixteen rods and eight links, being one-half of said fence so
divided and set to the defendant, as stated in the declara-
tion, and in addition to that sum, allowed to him interest on
the same, for a period extending back more than fourteen

*Middlesex,*
July, 1851.

Wright
*v.*
Wright.

years before said division and award, and before any claim or demand was made by the plaintiff of the defendant for the division of said line of fence, making together the amount of said award. To the admission of this evidence the plaintiff objected, and the court rejected it.

The defendant filed his motion in error, in pursuance of which the record was transmitted to the superior court; and the questions of law arising thereon were reserved for the advice of this court.

*Toucey,* (*a*) for the plaintiff in error, remarked *in limine,* that the whole state was, at first, owned in large tracts, which have since been divided up. The claim of the plaintiff is, that a party may go back 100 or 200 years, and break up all the divisions and arrangements of fences, through all that time, when there is no record, and so continue forever, breaking up as fast as made.

He then contended, 1. That the fence-viewers had no jurisdiction in the case. It is averred, that the fence in question had never been divided. If so, the division pertained to the select-men, under the 4th section of the statute. The statute intends to embrace all cases of difficulty. In the first place, by this section, when there is a fence between adjoining proprietors (an outside fence to each,) which has never been divided, the select-men may be called upon.

Secondly, when two persons own an enclosed lot in severalty, as if one owns the *East* half, and the other the *West* half, and there is *no fence* between their parts, or when by sale, &c., an enclosed lot is divided between two, and there is no fence between their parts, the fence-viewers may be called upon. See 7th section.

Thirdly, when by sale, &c., an enclosed lot is divided between two, and there *is a fence* belonging to the lot running between their parts, the fence-viewers may be called upon. See section 8.

Fourthly, by the same 8th section, when there *has been a division* between any adjoining proprietors, and *there is no record* of it, and the parties cannot agree *where it is,* the fence-viewers may be called out.

(*a*) In the place of *McCurdy,* who was originally concerned in the case, and prepared the brief.

The second clause of the 8th section has no reference to the first, and is not confined to cases of sale, &c., but is general. The first clause was enacted in 1843, and the second in 1848.

Any other construction of the second clause brings it into conflict with the 4th section. When therefore the declaration says, there never was any division of the fence, the case is brought under the 4th section.

The first clause of the 8th section applies to an *inside* fence, *belonging* to the lots. If it applied to an *outside* fence between *outside* adjoining proprietors, it would come in conflict with the 4th section. The term "*particular inclosure,*" does not mean necessarily a single *lot*, but a *tract*, owned by one man; and it may have fences across it, &c. *Vide* 14 *Conn. R.* 298. opinion of *Sherman*, J. in *Studwell* v. *Ritch.*

2. That the rights of the parties are settled by *prescription.* First, in 1826, at *the time* of the sale, there had been a division of the fence, (which must now be presumed to have been in writing, *Curtiss* v. *Beardslee*, 15 *Conn. R.* 522.) for thirty years, and the rights were fixed and could not be altered.

Secondly, if they could *then* have been altered, on account of the *sale* at that time, the right was lost, by the long interval between 1826 and 1849, twenty-three years.

Prescription is equivalent to a *record* title, and where the statute says "when there is no record of any division," it means no record or prescription, which is the same thing. Prescription, as a title, is never *mentioned in any statute.*

There is the same necessity for prescription to settle titles to fence, as to all other rights. If, when there has been a division acted upon for fifty years, and expensive arrangements made in reference to it, of fences, walls, offsets, buildings, &c., the whole can be broken up, by the sale of one party, the mischief would be incalculable. No man could make himself safe, by any precaution.

3. That the principle of estoppel applies to this case. See *Noyes* v. *Ward,* 19 *Conn. R.* 250. 1 *Greenl. Ev.* and the cases there cited.

4. That prior to the statutes of 1843 and 1848, (*sec.* 8, of

*Middlesex,*
July, 1851.

Wright
*v.*
Wright.

the new edition,) the rights of the parties had *become settled,* and they could not be altered or diverted by that section.

5. That the declaration is palpably insufficient. The pleas are sufficient, and judgment should have been for the defendant below, upon the demurrer.

6. That the evidence of gross mistake or misconduct should have been allowed, to prove the affirmative of the issue. It was proof of a clear excess of jurisdiction, by gross mistake or misconduct.

*Spencer,* for the defendant in error, contended, 1. That the plea of the statute of limitations is bad, because it appears from the pleadings, that the action was brought on the 20th of *March,* 1849, and the cause of action, which is the award of the fence-viewers, arose in twenty days after the 24th of *January,* 1849, the date of the award.

2. That the testimony of *Aaron Stevens* to prove the misconduct of the fence-viewers, was properly rejected; because, first, it did not tend to prove any misconduct or error. The fence-viewers had a right to consider the loss of interest, if, in their opinion, necessary to do justice between the parties.

Secondly, the proceedings of the fence-viewers were not subject to the revision of the county court. They are an independent tribunal; and the county court has, in relation to them, no appellate jurisdiction. If their award could be set aside for error in the rule or principle adopted by them, it can only be by a court of equity upon petition brought for that purpose, analogous to the law respecting the setting aside of the awards of arbitrators. *Brown* v. *Green,* 7 *Conn. R.* 536. 542. *Newland* v. *Douglass,* 2 *Johns. R.* 62, 3. *Barlow* v. *Todd,* 3 *Johns. R.* 367. 369.

Thirdly, one of the fence-viewers themselves was not a proper witness to invalidate their award, by showing misconduct. They ought to be excluded on the same ground that jurors are not permitted to expose the proceedings of the jury-room; or that officers are not permitted to invalidate their own returns; or that arbitrators may not show their own mistakes.

3. That the inability to agree upon a division of the fence, is sufficiently stated; the declaration following the language of the statute.

4. That the plaintiff had a right to a division of the fence between him and the defendant, in *July*, 1826, immediately after the subdivision of the eighteen acre lot, notwithstanding the previous division of the fence between *Martin Wright*, sen., and the defendant.

First, he had this right under the first clause of *sect.* 8. of the statute relating to Fences; because here was, 1st, a *particular enclosure*, divided by sale. 2dly, the *parties in interest* were not able to *agree*, respecting the division of a fence *belonging to the enclosure*. By "*parties in interest*" are meant all those owning the adjoining lands, between which the fence stands; and by "*a fence belonging to the enclosure*," is meant, not an *internal fence* merely, or one entirely *within* the enclosure, but any fence *necessary to its security and protection*. 3dly, this construction is sustained by the reason and probabilities of the case. It would be contrary to the general policy of our law respecting fences, and to common sense and reason, that there should be any other than an equal and uniform rule respecting the obligation to fence. If the contrary construction were adopted, it would often happen, that upon the subdivision of a lot, one of the parties among whom it was subdivided, would have the *whole* fence to make, and another *no fence at all;* and this duty and exemption would extend to all their respective heirs and assigns. The obligation to fence should follow the title to the land, and should be uniform and equal. Any inconvenience which might be supposed to arise from the new division of the fence, upon the subdivision of an adjoining enclosure, is corrected by the ample power of the fence-viewers as to apportionment and compensation.

Secondly, the plaintiff has this right under the second clause of section 8, because, first, the adjoining proprietors cannot agree as to the *division* of the fence. Secondly, there is no *record* of any such *division*. There is no ground for the objection made to the declaration, on the ground that it does not allege that there is *no record* of a division. It expressly alleges, that there has been *no division*, and of course, it was unnecessary, and would have been superfluous to aver that there was *no record* of such *division.*

Thirdly, if the plaintiff had a remedy, it was not necessary for him to pursue it under *sect.* 4. of the statute. The

second clause of *sect.* 8. is supplementary to *sect.* 4. and is adapted to cases where, as in this instance, *sect.* 4. is totally inadequate, inasmuch as *sect.* 4. provides only for cases where there is a *wilful refusal* to divide the fence ; and it provides only for a *division* of the fence, without any award of *compensation* for that part of it which is set to the other party ; which would be unjust, in a great variety of cases.

5. That if, in *July,* 1826, the plaintiff had a right to this remedy, he has not lost it, by lapse of time since that period. Of course, it is immaterial whether the old division of the fence, before the subdivision of the eighteen acre lot, was by assignment, or by agreement, or by prescription. A new state of things arose upon that subdivision, and the only *prescription* which could fix the obligation to maintain the whole fence, upon the plaintiff, is one which has arisen since 1826, *i. e.* within a period of less than twenty-three years before the award of the fence-viewers. In this case, there is no duty on the part of the plaintiff to maintain the division fence between him and the defendant, arising out of prescription ; because first, the duty to make and maintain a division fence is thrown equally upon the adjacent owners by *statute,* and a *statutory* obligation cannot be waived or dispensed with by prescription.

Secondly, whatever may be the common law, or the law in *Massachusetts* and other states, as to *fences by prescription,* there is no such law in this state. The fundamental principle governing the subject of fences here, is different. At common law and in *Massachusetts,* no person is bound to fence his enclosure, unless by *statutory assignment,* by *agreement,* or by *prescription ;* and he may maintain trespass for damage done in his premises, although not fenced, unless he is under one or the other of the above-named obligations to fence. But in this state, a man must fence his enclosure, or take the proper means to have it fenced, before he can maintain trespass for damage done by cattle. There, the owner of cattle is *bound to restrain his cattle ;* here, the owner of land is *bound to protect his land.* Compare *Studwell* v. *Ritch,* 14 *Conn. R.* 295. with *Rust* v. *Low,* 6 *Mass. R.* 94. and *Thayer* v. *Arnold, 4 Metc.* 589. *Here,* where one *must* make a fence for the protection of his land, the fact of his having made and maintained one for any length of time, can-

not raise a presumption of an agreement to do so.   Nothing can be inferred but that he did it *exclusively for his own protection*, independently of any obligation towards any other person.   And certainly, acts done by one on his own land, for however long a period, which he had a right to do, and which were necessary for his protection, and were done exclusively for his own benefit, can never grow into a right in another party to insist upon the former continuing to do these acts indefinitely, for the benefit of the latter.

Thirdly, the time which elapsed between 1826 and 1849, is too short to fix such a prescription.   If it exists at all, it must be by virtue of "*a usage beyond the time of memory.*" And the time of legal memory, which originally dated from the reign of *Richard* I., is certainly not less than sixty, or at the shortest, forty years.   8 *Pick.* 511.   10 *Pick.* 295.   *Id.* 138.   This is an entirely different thing from an *easement*, which may be acquired by fifteen years' *adverse possession;* for here there has been no *possession* by the defendant, adverse or otherwise, and the right he claims to have acquired has no affinity whatever to an *easement.*   3 *Kent's Com.* 434.

ELLSWORTH, J.   This is an action to recover the amount awarded by certain fence-viewers, under the eighth section of "An Act concerning Fences and Common Fields." Among other things unimportant to the merits of the action, the declaration sets forth that the plaintiff and defendant are owners of enclosed lands, separated by a division fence or stone-wall, which it is their duty, mutually, to build and maintain; that the plaintiff and those under whom he holds, having built the entire length of wall, it has become the duty of the defendant to unite with the plaintiff in dividing it, and to pay him one-half of its value.

The defendant objects to having any division whatever made, by the fence-viewers, and insists that he is not bound to abide by any such division, if made; nor to make or maintain, or pay for any part of this wall, let the fence-viewers do what they may.   The reasons for this are set forth by the defendant in his second plea.

The declaration further states, that the fence-viewers have been called out by the plaintiff, and have proceeded to make and to have recorded, a division of the wall between the

plaintiff and defendant, and have awarded to the plaintiff the sum of forty dollars, for that portion of the wall set to the defendant.

It is the opinion of a majority of the court, that the plaintiff had a good right to demand a mutual division of this ancient wall, and that the fence-viewers, having, by application to them, become vested with jurisdiction to proceed according to the provisions of the statute, had, as incident to such proceedings, power to award the payment of such sum as to them seemed just and reasonable ; and it is the question of their power and right to divide and apportion *anew*, a fence which had been maintained by the former proprietors, in a particular manner, for a series of years, which gives to this case its chief and general importance.

The defendant, in his second plea, would seem to rely upon a prescription or ancient practice, founded on a supposed agreement, entered into by one *Martin Wright*, which forever excuses the defendant from building or maintaining any part of the wall in dispute.   Before proceeding to the main question, we remark, that the defendant's plea is obviously defective in form.   The form and manner of pleading a prescription in bar, is familiar to every member of the profession.   In this case, no intelligible prescription is pleaded, by description or otherwise.   Nor is it averred to be obligatory upon the plaintiff.   Nothing more is stated than certain evidence conducing to prove some kind of a prescription, accompanied with a general averment, at the close of the plea, of the present duty of the plaintiff ; but this is not an averment of the necessary facts to sustain the plea.   Besides, it only states that *Martin Wright* and the defendant in fact divided a certain fence, many years since ; and that they, so long as the said *Martin* was in life, and the plaintiff since, as to his lot, have continued to maintain that particular fence according to said ancient arrangement ; but no perpetual obligation, as founded in such arrangement, and to run with the land to the present occupant, is averred, or can be inferred from what is averred.   And further, whatever usage or agreement is set up in the plea, or may be inferred from what is set up, relates to the two farms of the said *Martin Wright* and the defendant, as they existed, and were enclosed, in their *ancient* and *unbroken* state ; whereas divis-

ions and subdivisions have since taken place ; and strangers,
purchasers or execution creditors, ignorant of the existence
of any ancient arrangement, have become or may become
owners of these farms ; every parcel of which now sustains,
or may sustain relations to every other parcel, most essen-
tially qualifying any duties to fence, of an ancient date.

But to come to the main question in hand. What is the
effect of a division of fence, made by persons under whom
the parties claim title ? *Does such a division run with the
land through all time ?* Is an agreement, *unrecorded,* if not
unwritten, and perhaps unknown, of the nature of a covenant
which runs with the land ? This is an interesting question
of great practical importance to the people of this state. It
can be answered only by a careful study of the various pro-
visions of our statutes on the subject of fences, which have
been enacted from time to time, until there has been built
up a complete system of our own, somewhat peculiar per-
haps, but well adapted to general use, and quite satisfactory
to the people of the state.

The first section of " An Act concerning Fences and Com-
mon Fields," provides " that the proprietors of lands shall
make and maintain sufficient fences to secure their particu-
lar fields and enclosures." The second section provides, that
" when adjoining proprietors enclose their land in severalty,
*each shall make and maintain one-half of the division fence.*"
This duty of adjoining proprietors, the law attaches, by its
own force, to all private enclosures, as soon as they become
such. It is a legal incident or appurtenance attached to
such lands *per se,* and runs with them perpetually, furnish-
ing an intelligent rule of duty to every person who pur-
chases, or acquires by execution, enclosed lands. *Prima
facie* there is just such an incident, and no other ; the pur-
chaser relies upon it as a valuable part of his purchase ; and it
is the measure of his rights and duty in respect to others who
own adjoining lands. Such a rule adapts itself to land, both
while it is in the form in which it was when first enclosed, or
as it becomes by subsequent divisions and subdivisions. A
contrary rule would produce great confusion and embarrass-
ment, and effectually defeat the statutory provisions which
give a simple and uniform rule, and would establish in their
stead, rules secret and impracticable. Even between the

*Middlesex,*
July, 1851.

Wright
*v.*
Wright.

original parties, a parol contract to divide fences for all time, is void, as within the statute of frauds and perjuries, and doubly so, if it is held to bind third persons indefinitely, and through all mutations of the title. How, and when, and where, shall a purchaser or creditor about to have the land set off, find out the truth and extent of such a contract? Suppose, on enquiry, he is informed that there is something of the kind generally believed, or that there is a practice of long standing, as the plea says there is, in the present case, having, as is said, its origin in some usage of ancient date, at a time when the lands and fences were of very little value; what now shall be done in order to be safe? Who is to decide how the fact is? And at whose risk is the question to be decided? We think such an ancient usage, if admitted at all, should be construed with reference to the subject matter, and held to be a temporary arrangement, to govern the then owners, under the existing circumstances of the property. If the arrangement be full and explicit in its language, we think it should rather be confined to the parties to it than extended to others, in the nature of an obligation running with the land, binding every part and parcel of it, into whose soever hands it may have passed. Suppose that two farms in the neighbourhood of one of our cities, have been enclosed, at an early period of their occupancy, by an unimportant fence, each owner being accustomed to build and maintain a certain portion of it, for a series of years; is this simple fact to establish a prescription that this identical division is to continue without end or alteration? And suppose these farms are now sold, and divided into different building lots, which are purchased by various individuals, who know nothing of the original division of fence, or how long it was to continue; is the ancient practice to controul? We do not say, that parties *cannot* bind *themselves*, and others, who *assent*, by contract, to build and maintain fences for all time, though such a transaction would be quite extraordinary and improbable; but we do say, that *verbal agreements for dividing fences do not, per se, like covenants, run with the land in its transfers, against bona fide purchasers and attaching creditors; and that dividing and selling enclosed lands, prima facie, subjects them to a new division of fence among the new owners.* We admit, this rule of law may produce disappoint-

ment and injustice in individual cases, as where the parties have made a division and erected fences accordingly, or have regulated their conduct according to an existing division; and one of them now sells out to a stranger, who insists on a new division. In such case, it is asked, does this act of one of the parties break up the division of fence agreed to by them, or does it not rather require the purchaser to take the place of his grantor? We answer, a contract for the present division of a mutual fence, must, in the absence of explicit language to the contrary, be construed with reference to the subject matter, that is, with reference to the *parties* who made it, and to *their* enjoyment under their stipulated division. We know not how third persons can be made parties to the agreement, without their knowledge and concurrence, unless indeed, we hold these agreements to run perpetually with the land, like covenants. The provisions of the statute are explicit and important; and we are confident less injustice will be done, by fully adhering to those provisions, and holding that land passes with the legal incidents already mentioned, than by holding the contrary doctrine claimed by the defendant. Indeed, we believe this 8th section of the act passed in 1848, was designed to meet just such a case as the one before us. "Whenever by sale, &c. &c., a particular enclosure has been, or shall be divided between two or more persons, &c., or whenever *adjoining* proprietors cannot agree, &c., said fence-viewers shall view said fence, and make such divisions and apportionments," &c. A new division of fence is contemplated as necessary, whenever land is divided or sold. So, the language of the 4th section is very significant; it declares that whenever a division of fence is made and duly certified by the select-men, and *recorded in the records of the town*, it shall be valid and binding on the *parties*. So, in the 19th and 21st sections, the law contemplates the necessity of altering the division fences of common fields from time to time, as new proprietors come in, and provision is made therefor.

It is further claimed, by the defendant's counsel, that the plaintiff does not bring his case within the provisions of the 8th section of the act, because it does not appear there is no record of any division of such fence. The declaration avers

*Middlesex,*
July, 1851.

Wright
*v.*
Wright.

there has never been a divided fence between the *parties,* which implies there is no record of any division ; and besides, the defendant does not, in his plea, pretend there has been any record, or any division whatever, except the ancient division made between the two *entire tracts* of land, by the ancient proprietors ; and that is a division which we hold is not obligatory upon the plaintiff.

Much has been said about a prescriptive right to compel the defendant to maintain the entire fence, and we have been referred to *Rust* v. *Low* & al. 6 *Mass. R.* 90. for the law of prescription contended for by the defendant's counsel.

We have no occasion to look abroad to learn how to interpret and apply our own statutes to a case situated as this is. Nor do we suppose that the common law is the same in *Connecticut* as in *Massachusetts* and *England.* Here, a person is obliged to fence against cattle, at his own risk ; and if his land is not fenced, he can recover no damages or impound for a trespass by cattle, as was settled in *Studwell* v. *Ritch,* 14 *Conn. R.* 296 ; whereas in *Massachusetts* and *England,* the owner must restrain his cattle, at his own risk, or he will be liable, if they trespass upon the lands of others.

Again, as to the effect of time, we do not perceive how it can be shown that the plaintiff is bound by prescription, to maintain this entire fence, because his grantor originally built it, and the plaintiff and defendant have enjoyed it more than fifteen years. The defendant has gained nothing by an adverse enjoyment, nor has the plaintiff lost any thing. It was the duty of both to maintain the fence ; and there is nothing *adverse* about it ; hence the plaintiff is not precluded by any thing in the nature of a statute of limitation. The enclosing of one's land by a fence, more than fifteen years, creates no prescriptive duty forever thereafter to maintain it. Why should it ? Enclosing one's land is no more than one is obliged to do, in order to enjoy it fully and securely, and no more than he and his neighbour were bound to do, in common, until a voluntary or forcible division is established. Suppose a person in the environs of one of our cities encloses his entire ground by a handsome and expensive fence, and the owner of the adjoining lot needing only a common post and rail fence, if any at all, is not called upon to contribute to the expensive fence, and the whole is built without his aid ;

*Middlesex,*
July, 1851.

Wright
*v.*
Wright.

has the one who built the whole fence, by this generous act of his, fixed a servitude upon himself and upon his land, every part of it, which will continue forever?

Even as evidence of an agreement to continue to do as he has done for so many years, (and it can be urged in no other point of view,) he certainly can resist the proof, and shew *why* and *how* he did it, *i. e.* for his own accommodation, and not because of a mutual agreement with his neighbour, obliging him to do it. A prescriptive title is always founded in a presumed grant or agreement; and in this it differs from a title by adverse possession, which is strictly no title at all, but an inability in the plaintiff to assert his right; though in *Connecticut*, and recently in *England*, by statute, a title is held to be *acquired*, under the statute of limitations.

Now, in the present case, it is certain, the *plaintiff* has never entered into an agreement to build and maintain this entire fence, but quite the contrary. The fact is, that old Mr. *Martin Wright* at first built the fence himself, and the plaintiff has only owned it and enjoyed it, together with the defendant, for some twenty years; repairing it as it needed to be repaired. Viewed, therefore, in any light, we do not perceive how the defendant can resist the claim of the plaintiff for a new division of the fence, and for the recovery of the damages awarded by the fence-viewers.

There remains one further objection to the plaintiff's right to recover, namely, the allowance of interest by the fence-viewers, in their award. The language of the statute, which gives fence-viewers jurisdiction to make partition and award damages, as they deem just and reasonable, is very broad and comprehensive: "And said apportionments and award shall not be invalid, in consequence of any inaccuracy, if the location of said division, the respective parties, and the sums awarded, can be understood." A majority of the court think the fence-viewers have not exceeded their *jurisdiction*, and that for mere error of judgment in fixing the sum of money to be paid by one party to the other, if such there is, we cannot set aside their proceedings as oppressive and void. The same may be said as to the allowance of the forty dollars. How much the plaintiff had done towards maintaining the wall since 1826, and for what, exactly, this sum was awarded, we cannot know. The subject matter was within the

jurisdiction of the fence-viewers : *they divided the fence*, and awarded the aforesaid sum, as in their view, just and reasonable, and we cannot overhaul their judgment.

In this opinion CHURCH, Ch. J., and STORRS and HINMAN, Js., concurred.

WAITE, J.  The statute requires each of two adjoining proprietors of lands, occupied in severalty, to make and maintain one-half of the divisional fence, and prescribes the mode in which either, at pleasure, may compel a division of the fence, in case they cannot agree upon the same.

And when such division has been *legally made*, it is not in the power of either party alone, without the consent of the other, directly or indirectly to vacate or annul that division. And it makes no difference in what manner that division was made, whether by the select-men or fence-viewers, in the manner prescribed by statute, or by the voluntary agreement of the parties.

Nor is it a matter of any consequence, whether the division is proved, by an instrument executed with all legal formality, and duly recorded, or by an usage, of so long continuance, as to furnish sufficient evidence of *a legal division*. When made and proved, in either of these modes, it is, in the language of the statute, " valid and binding upon the parties," and all who claim under them.

To allow a division made by the select-men or fence-viewers, in the manner authorised by statute, to be set aside, at the pleasure of one of the parties, would be to render such a proceeding but an idle farce, a result never contemplated by the legislature.   And to permit a party to break up a division, once legally made, by his voluntary agreement, without the consent of the other party, would be a violation of the clearest principles of law and justice.   Such a law would be literally one " impairing the obligation of contracts," and such as no state legislature can constitutionally establish.

It has been claimed, that nothing short of record evidence will be sufficient to prove a legal division.   It is undoubtedly the policy of our law to make, as far as possible, all titles to real estate, appear of record.   But this, in every case, cannot be done.   The record title of a farm may be in one person,

and yet another, by fifteen years' adverse possession, may
have acquired a title to a portion of the farm; another, by long *user*, may have gained a right of way over another part;
and still another, by a like *user*, may have acquired a right to flow another portion.  And although the records shew nothing of the titles thus acquired, yet they are just as valid and effectual, as if proved by the most solemn instruments, and the record title must yield to their superior efficacy. The purchaser, therefore, to ascertain the true title to the property, which he is about to purchase, must not only look to the records, but the manner in which the property has been used and occupied.

The same principle, in my judgment, applies to the surrounding fences.  It is the duty of the purchaser, to inquire what portions of them belong to his vendor to maintain and keep in repair, and what to the adjoining proprietors.  And, upon the purchase, he succeeds to all the rights and privileges of his grantor, and nothing more; and these, like every other title, connected with real estate, may be shewn, either by the records, or by an usage for such length of time, as in like cases, will furnish sufficient evidence of title.

In my judgment, it makes no difference, whether the whole tract belonging to the vendor, is sold to one individual, or separate portions to different persons.  In either case, the rights of the adjoining proprietors will remain unaffected, by the sale, and no injustice will thus be done to the purchasers.  The one who buys adjacent to the fence, which his grantor was bound wholly to maintain, will take that circumstance into consideration, in determining the price which he can afford to pay, and act accordingly.  While another, who purchases land adjoining a fence belonging to another person to keep in repair, can afford to pay the more, on that account.

But to require old divisions to be broken up, and new ones made, every time a person sells a portion of his land, will impose intolerable burdens and hardships upon the adjoining proprietors; and no one can tell when he has discharged the duties, imposed upon him by law, in relation to the fences surrounding his land.  He may, at great trouble and expense, procure a division to be made, by the select-men of the town, and then make his half in the most thorough and

*Middlesex,*
July, 1851.

Wright
*v.*
Wrignt.

substantial manner.   To-morrow, his neighbour sells a por-
tion of his land, and the purchaser calls for a new division,
and the purchase of one-half of his share of the division fence.
If this can be allowed, then a party who has once made a
division, and made one-half the fence according to that divis-
ion, may be subjected to the trouble and expense of a new
division, and the purchase of another portion of the fence,
which may be such as he does not want, and would not have,
if he could possibly avoid it.   And thus the process of mak-
ing new divisions, new appraisals, and new purchases, must
be repeated, upon every sale of a portion of the adjoining
land.

Indeed, we need not look beyond the present case to wit-
ness the evils resulting from the doctrine contended for by
the plaintiff.   What are the facts set forth in the declara-
tion and pleadings, and admitted by the parties?   *Martin
Wright* owned a tract of land adjoining the defendant's, the
divisional fence between which had been divided, and the
division acted upon, for a period of more than thirty years;
*Wright,* and those under whom he held, maintaining the
*Southerly* and *Easterly* half; and by fair inference, the de-
fendant the remaining half.

In 1826, the plaintiff purchases a portion of *Wright's* land,
adjoining his fence, and from that time down to the year
1849, a period of more than twenty years, continues to main-
tain that fence, as his own.   And then, after a division of
fence had been acquiesced in, by all parties interested, for
more than half a century, and he and those under whom he
holds, had maintained the fence in question, during all that
time, as their own; and the defendant, for aught that ap-
pears, had, during the same time, supported a like portion;
the plaintiff calls out the fence-viewers, causes his fence to
be divided, and one-half to be appraised, with interest for
more than fourteen years, and then sues the defendant to re-
cover the appraised value and the interest.

Upon what principle, either of law or justice, the action
can be sustained, and especially for the interest upon the
value of the fence, previous to the appraisal, I am unable to
understand.   It has been said, that the remedy is given, by
the statutes passed in the years 1843 and 1846.

But the rights of the parties became vested, at the time of

the plaintiff's purchase in 1826, after a practical division had been made and acquiesced in, for a period of more than thirty years, and the first statute was not passed until 1843, after a like acquiescence, on the part of the plaintiff, for a period of more than fifteen years. And there is nothing in the language of either statute requiring a retrospective operation.

*Middlesex,*
*July, 1851.*

Wright
*v.*
Wright.

It is true, the latter statute authorizes a division, where there is *no re ord* of any division. But this must be understood as applying to cases where the division cannot be proved, by record evidence, *or that which is equivalent.* In this respect, as already stated, a right relating to the adjoining fence, stands upon the same ground, as a right of way or a privilege in a water-course, and may be proved in a similar manner. It surely could never have been the intention of the legislature to authorize the breaking up of all ancient divisions of fences in the state, such as can be established by immemorial usage, merely for want of record evidence. And I presume it will not be claimed, by any one, that a division of fence, which has never been recorded, and which cannot be supported, by an usage equivalent to record evidence, will be binding upon one who buys without knowledge of any such division. But where such division is established, in either way, it will have the same effect as any other right in the land supported by similar evidence, and the purchaser must take the land *cum onere.*

But, in my judgment, those statutes were never intended to apply to any external fence which had been divided, but only to such as had never been divided, and such internal lines as had been created by the sale of lands, in separate parcels, to different individuals. Under such circumstances, each purchaser is entitled to a division of such fences around his land, as had never previously been divided, and nothing more.

But were the construction otherwise and the statute construed as extending to all dividing lines around each parcel, without regard to any former division, still I do not see upon what ground the plaintiff can recover, in his present suit.

The revised statutes, which were in operation when the fence-viewers acted, required them to " make such divisions and apportionments as might be necessary *to do justice to all parties,* and award in favour of such parties and against such

*Middlesex,*
July, 1851.

Wright
*v.*
Wright.

parties, as they should deem just, such sums as in their judgment would be reasonable." *Rev. Stat.* 373.

To comply with these requirements, it was their duty, not merely to divide the plaintiff's fence, and determine the value of one-half, but if, in their judgment, the defendant ought to assume the support of one-half of the same, to determine who should support a corresponding portion of the defendant's fence, and to award the payment, by the defendant, of only such sum as would equal the excess in value, if any, of the plaintiff's fence awarded to him, over that which had been transferred from him to some other party.

In such manner only could substantial justice be done to the defendant. But instead of that, the fence-viewers have made no provision in their award, by which he may be remunerated for the money which they have required him to pay, or by which he may be exonerated from the support of any portion of his fence. In what manner is he to be reimbursed for the burdens thus cast upon him? Is he to call upon the other purchasers of *Wright's* land, and compel them to purchase portions of his fence, and keep them in repair? This, in my judgment, would not only be imposing unreasonable hardships upon the defendant, but would do palpable injustice to the several grantees of *Wright.*

If the plaintiff, by this operation, can compel the defendant to pay him forty dollars for one-half of his fence, then he, in effect, gets his land so much less than the price, which he stipulated to pay. And if the other grantees are liable to pay the defendant a like sum, then they are compelled to pay so much more than they had agreed to pay; an effect, which, I am confident, was never contemplated by *Wright,* nor any of his grantees, at the time of his conveyances to them; nor by our legislature, in prescribing the mode in which fences might be divided. Nor is it in conformity with the provisions of the statute requiring fence-viewers to make such divisions and apportionments as would be *"necessary to do justice to all parties."*

For these reasons, I would advise the superior court to reverse the judgment of the county court.

Judgment affirmed.